HEATHCOCK, Administrator, Respondent, vs. MILWAUKEE-PLATTEVILLE LEAD AND ZINC MINING COMPANY, Appellant.

*February 27—April 17, 1906.*

*Master and servant: Assumption of risk: Promise to remove danger: Reasonable time for fulfilment.*

1. A servant who, in reliance upon the master's promise to make repairs or remove a danger, continues in the service for a longer time than is reasonably necessary for the fulfilment of such promise, assumes the risk.

2. Plaintiff's intestate, whose duties required him to go frequently
along a narrow passageway beside an unguarded mining shaft,
the danger from which was obvious, threatened to quit work
unless the opening of the shaft was guarded, but was induced
to continue at his work by the assurance of defendant's su-
perintendent that the place would be fixed in a short time.
Thereafter, though no guard was erected, he continued at his
work for seven days, when he fell down the shaft and was
killed. An abundance of suitable materials was at hand and
the work of guarding the shaft could have been done in half
a day by an unskilled laborer. *Held,* that deceased had assumed
the risk.

Appeal from a judgment of the circuit court for Iowa
county: George Clementson, Circuit Judge. *Reversed.*

This is an action to recover damages for the death of the
plaintiff's intestate, which occurred June 11, 1903, while he
was in the employ of the defendant, by falling down an open
mining shaft 100 feet deep. The complaint, among other
things, alleges, in effect, that it was a part of the duties of
the deceased to take charge of the hoist and to keep the fires
going under the boilers; that the boilers were located to the
east of the main shaft about twenty feet; that the hoist was
located over the shaft and about twenty feet above it; that
the boilers and the shaft were inclosed in the same building;
that the stairway led from the ground to the hoist; that the
foot of the stairway led from a point a little west and north
of the mouth of the shaft to the hoist on the ground above;
that in going from the hoist to the boilers, and from the boil-
ers to the hoist, in the discharge of his duties it was neces-
sary for the deceased to pass very near to the mouth of the
shaft; that June 11, 1903, there was no barrier or railing of
any kind around or at the mouth of said shaft to protect the
deceased from falling into the shaft when about his duties as
such employee of the defendant.

Issue being joined and a jury trial waived, the court at the
close of the trial of the case found as matters of fact, in
effect:

(1) Prior to January 1, 1903, the defendant sunk a shaft,

in size 5 x 6 feet, to a considerable depth, in the ordinary way of mining, until the rock and dirt taken therefrom, called the dump, had accumulated about the mouth of the shaft to the height of ten or twelve feet. It then became necessary to establish steam hoisting machinery, and in March, 1903, the dump was removed, leaving the mouth of the shaft level with the surface of the ground. A building or shed of considerable height was constructed about and over the shaft with a boiler and engine room adjoining, which building was narrow from east to west, the east side of it coming within three and one-half feet of the mouth of the shaft, and the west side of it within five or six feet from the mouth of the shaft. Above the shaft and twenty-four feet from the ground a landing platform was erected which was twelve feet square, in which a hole three and one-half feet square was cut directly over the shaft, through which tubs from the shaft could come and be placed upon a car by the side of the opening, which car was run from the landing platform along a tramway some thirty-five feet to the outside of the building, and the tubs there emptied. The space between the landing platform and the mouth of the shaft was open. The hoisting of the tubs was done by a steam hoist which was operated by a lever that was upon the landing platform, and the person in charge of the hoist operated the lever, and his assistant landed the tubs upon the car and ran them out upon the tramway and emptied them. It was the duty of the one in charge of the hoisting to go down as often as four times a day to keep the fire up under the boiler. The landing platform was reached from below by a winding stairway that started three or four feet from the mouth of the shaft, and the person who came down from the platform to go to the boiler room, after reaching the ground, had to go around the mouth of the shaft and pass on the east or west side thereof, and, on returning from the boiler room, he had likewise thus to go around the shaft to reach the foot of the stairway. The building, landing

platform, and the hoist were completed in the manner described April 22, 1903, and thereafter everything taken out of the shaft or let down into the shaft was by the steam hoist.

(2) The mouth of the shaft when the mine was not being operated was covered by a double trap door, but while work was being done in the mine these doors were necessarily open. The half of the door on the south side, when open, lay over flat on the ground, and the north half went beyond the perpendicular and rested against the top of a ladder that came out of the north side of the shaft. On the east and west sides of the shaft, when the doors were open, there was nothing between the sheer edge of the shaft and the sides of the building.

(3) When these doors were open and the mine was being worked, the unprotected mouth of the shaft, especially in view of the limited space upon its east and west sides, was a dangerous place, and the defendant through its officers, in the light of attending circumstances, ought reasonably to have foreseen that, unless a guard curbing was put around the mouth of the opening sufficiently high to prevent a person from accidentally falling into the shaft as a natural and probable result of the absence of such guard curbing, a workman, whose duty it was to pass between the foot of the stairs of the landing platform and the boiler room, might probably fall down the shaft, which was 100 feet deep.

(4) The deceased was at the time thirty-three years of age, and had a wife and two children aged six and three years, who were dependent upon his labor for support, a good miner, and began work at this mine for the defendant in January, 1903, at $1.75 a day, and continued to work for the defendant at that place until June 11, 1903, when he was killed by falling into the shaft. He worked part of the time down in the mine and the remainder of the time above ground. After May 1, 1903, when he was working above ground, his place was upon the landing platform managing the hoist, and in-

cidental to this employment it was his duty at least four times a day to go from that platform down the stairs by the course described to the boiler room to attend to the fire. Up to the time of his death he had been managing the hoist in all about fifteen days. About 10 o'clock of the forenoon of June 11, 1903, after having stated to his assistant that the next time he went to the boiler room he would bring up the clock that was there, he started to the boiler room, and that was the last time he was seen alive. He fell into the shaft with the clock, soon after, and was killed.

(5) The proximate cause of his death was the want of a guard around the mouth of the shaft.

(6) About seven days before he was killed the deceased told Stephens, the superintendent of the mine, that he wanted some protection put around the top of the shaft, that it was dangerous to a man going from the platform to the boiler room and back, and if this was not fixed he would look for another job. Stephens told him that he would have it fixed in a short time. Relying upon this assurance and induced to do so thereby, the deceased continued to work.

(7) From the time this promise was made until the deceased was killed was not an unreasonable length of time for him to work in the belief that the promise would be fulfilled, and he did not thereby waive the promise and assume the risk of the unguarded shaft.

(8) It would not have taken more than a half day's work to have properly guarded the shaft. The deceased had no right to put a guard around it, as that would have been outside of his business to meddle with any of the arrangements about that shaft.

(9) There was nothing in the testimony to show that at the time the deceased fell down the shaft he was not exercising ordinary care for his safety under all the circumstances, and the presumption is that he was at the time exercising such care.

(10) Due notice of such death and that satisfaction therefor was claimed from the defendant was served on the defendant January 27, 1904.

(11) The damages sustained by the plaintiff for the benefit of the widow of the deceased are $3,000.

As conclusions of law the court directed judgment to be entered in favor of the plaintiff and against the defendant for $3,000 damages and costs to be taxed. From the judgment so entered the defendant appeals.

It also appears from the undisputed evidence that the deceased had worked at this hoist at least fifteen days in May and June, 1903, and during all that time he had exclusive charge of the hoist and of the engine and boilers; all the rest of the time from January 5, 1903, to June 11, 1903, he had worked down in the mine, going down into it and coming up out of it through the mouth of this shaft every day; that the conditions at the mouth of the shaft on June 11th were the same as they had continued to be, unchanged at least from April 22, 1903, and that all of such conditions were open to the view of any person in the building and particularly to a person coming down from the platform to the foot of the stairway near the northwest corner of the shaft; that in the same forenoon the deceased had made one trip down from the platform to the boiler house and returned before starting on the trip on which he met with the accident; that there was abundance of material suitable for making a barrier or protection around the mouth of the shaft, and the work of putting it up could have been done effectively in not to exceed half a day by an unskilled laborer; that it did not need a carpenter; that it would have been a very easy thing to construct such barrier, and any of the men around there could have done it themselves.

For the appellant there was a brief by *Woodward & Lees,* and oral argument by *G. M. Woodward.*

For the respondent there was a brief by *Levi W. Pollard*

and *Smelker & Smelker,* attorneys, and *Aldro Jenks,* of counsel, and oral argument by *J. P. Smelker.*

CASSODAY, C. J.   The facts are undisputed.   The only controversy is as to inferences and conclusions to be drawn from admitted facts.   The passageway from the foot of the stairs—three or four feet from the northwest corner of the open shaft—to the boiler room was close by the side of the open shaft.   That opening was five feet one way and six feet the other way, and had been level with the surface of the ground from March, 1903, to the time of the accident.   Such passageway between the west side of the opening and the building was less than six feet wide, and the passageway between the east side of the opening and the building was only three and one-half feet wide; and each of such passageways came to the sheer or perpendicular edge of the shaft.   In going from the foot of the stairs to the boiler room it was necessary to pass over one or the other of such passageways.   Which of the two the deceased passed over at the time of the accident does not appear.   The conditions at the opening of the shaft appear to have been substantially the same from April 22, 1903, to the time of the accident.   For fifteen days prior to his death it was the duty of the deceased, at least four times a day, to go from the foot of the stairs mentioned to the boiler room by one or the other of the passageways described.   During the time the deceased worked down in the mine he went to his work down through the shaft in question and came from his work up through the same shaft.   At the time of the accident he had necessarily become perfectly familiar with the situation at the mouth of the shaft.   In fact, it was open and obvious to any person looking at it.   The trial court was certainly justified in finding, in effect, that the space between either side of the open shaft and the side of the building was so limited and narrow as to be dangerous to a person passing over the same; and that in the light of the

attending circumstances such danger ought reasonably to have been foreseen and guarded against by the defendant's officers. The movements of men along such passageways, under such circumstances, were necessarily attended with more or less hazard. A person passing over such a narrow space, with the open shaft 100 feet deep from two to four feet from him, was necessarily exposed to the hazard of a misstep, an unexpected jar, or a sudden diversion, which would be liable to terminate in death. The judgment in this case is based upon the failure to guard against such danger by the officers of the company. Such danger ought reasonably to have been foreseen by the deceased as well as the officers of the company. The trial court did not so specifically find, but, in the opinion filed in the case, it is stated that the danger of the unguarded shaft was obvious to the deceased, at least from the time the steam hoist was put in, April 22, 1903, and that such danger was one of the risks of the employment which he assumed, and that such assumption continued until seven days before his death, when he threatened to quit work unless the opening of the shaft was guarded, and the deceased was then assured by the defendant's superintendent that the place would be fixed. Thus it appears from the findings of the court that the deceased had known of the conditions at the mouth of the shaft, where he was at work daily, for more than forty days prior to making any complaint, and that for eight days of that time he had charge of the hoist, and during those eight days he passed over the dangerous places described, going to and coming from the boiler room, at least eight times a day. The court held that the deceased had the right to rely upon such assurance for a reasonable time and that during such reasonable time such assumption of risk was suspended, and that such danger to him was not so obvious and immediate that it could be said, as a matter of law, that to continue such work was inconsistent with reasonable prudence on his part. For the purpose of this appeal we assume that the trial court was

justified in holding that the deceased had the right to rely for
a reasonable time upon such promise of the superintendent
without himself assuming the risk of the danger.

The question recurs whether the deceased was justified,
under the circumstances, in relying upon such promise for
the period of seven days. While the adjudications are not
uniform, yet the better opinion, and the one most in harmony
with the decisions of this court, is that the servant is justified
in remaining only for such a time as is reasonably sufficient
for the master to make the repair or remove the danger.
Thus, it is held in a well considered federal case in the circuit
court of appeals that:

"A master is liable for an injury to a servant, resulting.
from an obvious defect and known danger, where the servant
relied on an express or implied promise by the master to make
repairs, for such time as would be reasonably required to re-
pair the defect, but no longer." *Detroit Crude-Oil Co. v.
Grable,* 94 Fed. 73, 78, 36 C. C. A. 94.

So in Illinois it was held that:

"The reasonable time for which a servant is entitled to
remain in service after his master's promise to repair defects
or remedy dangerous surroundings is such time as would be
reasonably sufficient for the master to fulfil his promise."
*Illinois S. Co. v. Mann,* 170 Ill. 200, 48 N. E. 417. To the
same effect: *Gunning System v. Lapointe,* 212 Ill. 274, 72
N. E. 393; *Dowd v. Erie R. Co.* 70 N. J. Law, 451, 57 Atl.
248; *Hough v. Railway Co.* 100 U. S. 213, 225.

Thus it was held by this court that if the servant "con-
tinues in the service for a time longer than it is reasonable to
allow for the performance of the master's promise he will be
deemed to have waived his objection and assumed the risk."
*Stephenson v. Duncan,* 73 Wis. 404, 41 N. W. 337. So in a
later case in this court it was said:

"When an employee notifies the master of a special risk,
and objects to continuing the work under the existing condi-

tions, and is induced to continue such work by a promise to remove the danger within a reasonable time, then for such time the employee is not presumed to assume such risk." *Erdman v. Illinois S. Co.* 95 Wis. 6, 12, 69 N. W. 993.

In a still later case it is said, in effect, that the unwillingness of an employee to continue work at his own risk with defective appliances "must be overcome temporarily by a promise to remove the danger within a reasonable time." *Yerkes v. N. P. R. Co.* 112 Wis. 184, 188, 88 N. W. 33.

The question to be determined, therefore, is whether seven days was more than a reasonable time within which to guard the open shaft and thus remove the danger. What is a reasonable time to remove a danger in any given case must, from the nature of things, depend upon the facts and circumstances of the particular case. What would be a reasonable time in one case might be very unreasonable in another case. This might be illustrated by reference to the facts in numerous cases which might be cited. In the latest Illinois case cited (*Gunning System v. Lapointe, supra*) it was held:

"The cases where a promise by the master to repair suspends the servant's assumption of risk are those where particular skill and experience are necessary to know and appreciate the defect and its danger, or where machinery or materials are used of which the servant can have but little knowledge."

This court has said that the principle that an employee is relieved of the assumption of the risk by the promise of the master to remove the danger is usually applicable "to machinery or tools which are found to be dangerously defective." *Showalter v. Fairbanks, M. & Co.* 88 Wis. 376, 382, 60 N. W. 257. The distinction is pointed out in the *Erdman Case, supra. Stephenson v. Duncan, supra,* which was referred to and apparently relied upon by the trial court, came to this court on an appeal from an order overruling a demurrer to the

complaint and the order was reversed on the ground that the complaint failed to state a cause of action in favor of the employee and against the master, who had promised to remove the danger about ten days prior to the accident. The plaintiff was employed in operating the defendant's shingle mill, which was alleged to be in an unsafe condition in that the saw was uncovered and projected over its frame partly across the narrow passageway along which he was obliged to go to tighten and loosen the belt. The removal of such danger might have required the readjustment of a considerable portion of the machinery in the mill and involved scientific skill and knowledge and required more than ten days to fulfil the promise; and yet this court said that the complaint might have been held to state a good cause of action had it not also alleged that "the defendant had ample time and opportunity, and was abundantly able, to repair and put in a safe condition the machinery and apparatus between the time the plaintiff informed him of its defects and the time when the plaintiff was injured, but neglected and failed to do so, as was his duty, for the protection of the plaintiff." And this court then said:

"This allegation fairly implies that the plaintiff continued his employment beyond the period of time within which he might reasonably expect the defendant would keep his promise and put the machinery in proper condition."

What was thus alleged in the complaint in that case by implication, is here established by the undisputed evidence in this case. The work of guarding the mouth of the open shaft was very simple and manifestly could have been effectively performed by an unskilled common laborer in not to exceed a half a day. There was abundance of materials suitable for constructing a barrier or protection around the mouth of the shaft, and any of the men around there in the employ of the defendant could easily have performed the work. We must hold that, after the defendant's unreasonable delay in removing the danger, the deceased must be regarded as having again

assumed the risk of the employment, the same as he had during the forty days before he threatened to quit.

*By the Court.*—The judgment of the circuit court is reversed, and the cause is remanded with direction to dismiss the complaint.